| | | |
|---|---|---|
| JULIE WANG, | ) | |
| | ) | |
| Plaintiff, | ) | No. 19-cv-03270 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| HOWARD CHUEH; | ) | |
| MICHELLE CHERESO, | ) | |
| DOLLIE FRILOUX, | ) | |
| TIM BRIDGES, and | ) | |
| and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

| | |
|---|---|
| HOWARD CHUEH, | ) |
| | ) |
| Cross-Plaintiff / Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| RASHAD KILGORE, ASHOOR HOYOU, | ) |
| DAVID SALAZAR, PATRICIA STRIBLING, | ) |
| EDDIE JOHNSON, as Superintendent, and | ) |
| THE CITY OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This case arises out of a domestic dispute between Julie Wang and Howard Chueh.[1] R. 1-1, Wang Compl.[2] In short, when the two were spending time together one night, Wang ended up with severe injuries on her face. She says Chueh beat her; Chueh denies it. The only thing Wang and Chueh agree on is that the Chicago Police Department mishandled its response to the incident—but each believes a different set of officers was in the wrong.

Specifically, Wang brings a civil-rights suit against the City of Chicago, as well as three Chicago Police Officers—Michelle Chereso, Dollie Friloux, and Tim Bridges—because they allegedly helped Chueh cover up his wrongdoing. She also brings an indemnification claim against the City. The City and the three officers have moved to dismiss Wang's claims against them. R. 19. (Wang is also suing Chueh for battery and intentional infliction of emotional distress, but those claims are not at issue today in this motion.)

Then, separately, Chueh filed a third-party complaint against four *other* Chicago Police Officers—Rashad Kilgore, Ashoor Hoyou, David Salazar, and Patricia Stribling—as well as then-Police Superintendent Eddie Johnson and the City of Chicago (as a cross-defendant). R. 15, Chueh Compl. These four officers, according to Chueh, arrested him and charged him with domestic battery after the first set of

---

[1]The Court has federal question jurisdiction over Wang's § 1983 claims in this case under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Wang's state-law claims, as well as Chueh's third-party claims and cross-claims, under 28 U.S.C. § 1367.

[2]Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number. As a formal matter, this is Wang's second amended complaint, but for the sake of cleanly differentiating between Wang's second amended complaint and Chueh's third-party complaint, the Opinion will simply refer to Wang's operative complaint as "Wang Complaint" and Chueh's complaint as "Chueh Complaint."

officers (the ones being sued by Wang) chose not to arrest him or charge him. Chueh brings state-law claims for indemnity and contribution. The City and the third-party defendants have also moved to dismiss Chueh's claims against them. R. 46.

For the reasons stated below, the motion to dismiss Wang's claims is granted with prejudice. Because the only remaining claims in this case all arise under state law, the Court relinquishes supplemental jurisdiction over the entire case, which includes Wang's state-law claims and Chueh's third-party claims and cross-claims. Thus, the motion to dismiss Chueh's claims is terminated without prejudice and the case is remanded to the Circuit Court of Cook County.

## I. Background

As it turns out, Wang's complaint is the key one in this Opinion, so the Court accepts as true the factual allegations in it and draws reasonable inferences in her favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Chueh's complaint provides some context, so it is discussed as well, but none of the allegations in it are important in resolving the motion to dismiss Wang's complaint.

In August 2015, Julie Wang went to Howard Chueh's apartment in Chicago. Wang Compl. ¶ 7. Wang claims that while there, Chueh "held her down and beat her with his fists." *Id*. ¶ 9. Chueh allegedly left Wang with a fractured orbital in her right eye, a hemorrhage in her left eye, and "multiple contusions and abrasions about her face and body." *Id*. ¶ 10. Afterwards, Wang left Chueh's apartment and went down to the lobby of his apartment building, where Chueh's doorman called 911 and took

photos of Wang's injuries. *Id.* ¶ 11. According to Wang, she and Chueh had been "dating," though she does not specify for how long. *Id.* ¶ 8.

Chueh tells a completely different story. He denies any romantic involvement with Wang. Chueh Compl. ¶ 22. According to Chueh, the relationship was a lot more one-sided than Wang implies and actually bordered on stalking. *Id.* ¶ 20. He alleges that beginning in July 2015, Wang would show up unannounced and uninvited to various athletic clubs where Chueh played tennis. *Id.* ¶ 17. Wang also started showing up unannounced at his apartment building. *Id.* ¶¶ 18-19. (It is not clear why Wang suddenly started pursuing him, but Chueh implies that it has something to do with the fact that he was well-known enough as an amateur tennis player that Wang somehow discovered him and became interested in him. *Id.* ¶ 16.) The stalking became so unbearable, alleges Chueh, that at some point before the August 2015 incident he actually arranged with his building's security staff to bar Wang from his apartment building. *Id.* ¶ 20.

At the same time, Chueh does not dispute that he and Wang had some of platonic friendship. Chueh Compl. ¶ 25. But that relationship, alleges Chueh, was strictly limited to him giving her tennis lessons and her giving him dance lessons. *Id.* On the day of the August 2015 incident, for instance, Wang had called Chueh and asked him to play tennis; he apparently agreed, because she picked him up in her car and drove them to a tennis court. *Id.* ¶ 27. After they played tennis, they went to a restaurant for dinner, and then after dinner, Wang suggested going back to Chueh's apartment to "practice their dancing." *Id.* ¶ 29. They arrived at Chueh's apartment

4

at around 9 p.m. that night. *Id.* ¶ 30. According to Chueh, his building's security camera footage shows that he walked into the building normally but that Wang was meandering in a way that suggested she was drunk. *Id.* In Chueh's apartment, Wang took a shower, while Chueh made them drinks. *Id.* ¶ 31. They then began dancing, when Wang suddenly started to hit Chueh. *Id.* According to Chueh, Wang characterized what she was doing as "play fighting." *Id.* But Chueh claims that the "play fighting" became so "excessive" that he "was forced to attempt to subdue her to defend himself." *Id.* While defending himself, the pair "fell onto the couch and on the floor[,] injuring Wang's face." *Id.* After that, Wang "voluntarily" left Chueh's apartment. *Id.* The entire ordeal lasted around 45 minutes. *Id.* Chueh does not dispute that after Wang left his apartment that night, his doorman called the police. *Id.* ¶ 32. According to Chueh, though, it was the doorman's own decision to call 911; Wang did not report any battery to the doorman, nor did she ask the doorman to call the police. *Id.* ¶¶ 32-33.

In any event, after Chueh's doorman called the police, Officers Michelle Chereso, Dollie Friloux, and Tim Bridges showed up to Chueh's building. Wang Compl. ¶ 12. What happened next is disputed. Wang alleges that she told the officers that she had been the victim of an attack by Chueh, and she emphasized to them that she wanted to press charges against Chueh. *Id.* ¶¶ 13-14. Chueh, on the other hand, maintains that Wang was not able to articulate a clear story to the officers; rather, when they interviewed Wang, they found her story to be inconsistent. Chueh Compl. ¶ 36. The officers also interviewed Chueh, and he told them that *Wang* had initiated

5

the attack, and he had only been defending himself. *Id.* ¶ 37. There is no dispute that Officers Chereso, Friloux, and Bridges decided not to arrest or charge Chueh. *Id.* ¶ 39.

Wang thus concludes that Officers Chereso, Friloux, and Bridges "failed to conduct any legitimate investigation" into her allegations "and instead focused a sham investigation on the conduct" of Wang herself, "fabricated evidence, falsified reports, and provided false information to detectives and prosecutors." Wang Compl. ¶ 18. What is more, Wang alleges that they were actually working in concert with *Chueh* to "intimidate, deter and other prevent the arrest and otherwise undermine the criminal prosecution" of Chueh. *Id.* ¶ 17. That is where Wang's complaint ends.

But the story was not over. According to Chueh, the day after the incident, Wang went back to the Chicago Police Department and reported that she and Chueh had been dating, Chueh had threatened to "crush her face," and, on the night in question, Chueh had grabbed her by the hair and punched her with a closed fist. Chueh Compl. ¶ 43. On that same day (though it is unclear if this happened before or after Wang made her statements), Wang also saw Chueh walking in Chicago and called the police on him. *Id.* ¶ 49. He was arrested by Officers Rashad Kilgore and Ashoor Hoyou, and his case was then assigned to Detective David Salazar. *Id.* ¶¶ 49, 52. Salazar interviewed the original investigating officers (Chereso, Friloux, and Bridges) and also took Chueh's statement. *Id.* ¶ 59. Salazar and another officer, Patricia Stribling, eventually charged Chueh with aggravated domestic battery. *Id.*

6

¶ 63. According to Chueh, they charged him even though they knew Wang was lying and there was insufficient evidence to support an arrest. *Id.* ¶¶ 62, 64-65.

Ultimately, the criminal case against Chueh proceeded to trial in state court. Chueh Compl. ¶ 77. In April 2017, after a bench trial, the court found him not guilty. *Id.* According to Chueh, the only reason the case even got so far was because the second set of officers (Kilgore, Hoyou, Salazar, and Stribling) arrested him without sufficient evidence. *Id.* ¶¶ 78-79.

So, to sum up, Wang is now suing the Chicago Police Officers who initially responded to the incident and failed to arrest Chueh, while Chueh is suing the Chicago Police Officers who *did* arrest him the next day. Both parties also seek to hold the City liable under indemnification and vicarious liability principles.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

#### A. Motion to Dismiss Wang's Claims

The gist of Wang's claims against Officers Chereso, Friloux, and Bridges is that they fabricated evidence in the course of their investigation against Chueh, which then prejudiced Wang in her later legal proceedings against Chueh. To be clear, the analysis of this motion will only rely on the allegations listed in Wang's complaint, not Chueh's, and will assume the truth of Wang's allegations.

#### 1. Access to the Courts (Count 4)

Specifically, Wang alleges that Officers Chereso, Friloux, and Bridges violated her First, Fifth, and Fourteenth Amendment rights when they fabricated evidence and provided false characterizations of the August 2015 incident, which deprived

8

Wang "of the ability to properly prosecute her claims against" Chueh. Wang Compl. ¶¶ 36-37. Wang also alleges that the officers tried to "deter, conceal and suppress the investigation" of the beating. *Id*. ¶ 36. Although it is not explicitly articulated in the Complaint, Wang clarifies in her response brief that this count is essentially an access-to-the-courts claim under the First Amendment, as enforced via 42 U.S.C. § 1983.[4] R. 27, Pl.'s Resp. Br. at 2. The City is liable too, argues Wang, as the employer of the three officers in question (although earlier in the count, Wang clearly frames this claim as one against the Defendant Officers only). Wang Compl. ¶ 39.

In general, "[i]nterference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under § 1983." *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015) (citing *Bounds v. Smith*, 430 U.S. 817, 822 (1977)). For instance, "when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged." *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995). But the Seventh Circuit has also noted that a "cover-up" by police "is merely one, albeit important, factor in determining whether a denial of judicial access occurred; the plaintiff must also show that the police's actions harmed [her] ability to obtain appropriate relief. This will depend on factors such as whether the plaintiff was able to discover the facts

---

[4]Because Wang's complaint also makes reference to "failure to conduct any legitimate investigation," *see* Wang Compl. ¶ 18, Defendants understandably addressed that argument in their dismissal-motion briefing, R. 19, Defs.' Br. at 6-7. Specifically, Defendants pointed out that under *Rossi*, Wang has no constitutional right to have the police investigate her case at all. *Id*. (citing *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015)). But Wang later clarified that she was not pursuing a failure to investigate claim. Pl.'s Resp. Br. at 2.

9

on [her] own, whether a proper investigation was later conducted, and whether the true facts are disclosed prior to the expiration of the limitations period." *Rossi*, 790 F.3d at 736. So, "the operative question is not whether [Wang's] case would have been better had the police conducted a worthy investigation, but whether their failure to do so limited [her] ability to obtain legal redress to such degree that it constituted a denial of judicial access." *Id.* at 735.

Here, accepting all of Wang's allegations as true (and reading the complaint generously), the Court must assume that Officers Chereso, Friloux, and Bridges fabricated their findings about the incident. To be clear, all Wang really does is allege that the officers' "reports and testimony" were built on the "fabrication of evidence and false characerizations and description of" Wang. Wang Compl. ¶ 37. But for purposes of the pleading stage, that is enough. So, assuming the Defendants fabricated their reports about the domestic violence incident, the next question is whether that alone is sufficient to make out a denial-of-judicial-access claim. Specifically, Wang must allege that the "fabrication of evidence and false characterizations" sufficiently harmed her ability to obtain legal relief against Chueh.

To allege a viable claim of this type, the Seventh Circuit has set a high bar, repeatedly holding that where a plaintiff was personally involved in the events giving rise to a legal claim and thus knows all the facts of their case, access to the courts is generally not impaired by the fabrication of evidence by law enforcement. In *Rossi*, for instance, the plaintiff was assaulted by several people, including an off-duty police officer. 790 F.3d at 732-33. When Rossi went so far as to report the name and address

of the off-duty officer to the police, the investigating officer did nothing but file a false report with the wrong name and asserting that he could not find the name in the police roster. *Id*. at 733. As a result, the investigation stalled for years and material evidence was lost. *Id*. But the Seventh Circuit concluded that Rossi's court-access right had not been violated because he "knew all of the relevant facts of his case and was free to pursue legal redress at all times." *Id*. at 736.

Similarly, in *Thompson*, police had used excessive force on the plaintiff, then falsely omitted that fact from the police report of the incident. *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994). Again, though, there was no court-access violation because "the facts known to [the plaintiff] concerning the arrest were sufficient to enable him to promptly file the instant lawsuit[.]" *Id*. at 852. That is, the plaintiff could fully bring an excessive-force civil claim regardless of the content of the police report. And in *Vasquez*, the allegations went even farther; there, the police covered up the accidental shooting of a child, and the responsible officer was not identified until six months later, when an independent task force took over the investigation. *Vasquez*, 60 F. 3d at 329. Despite all that, the court again held that the family's access to the courts had not been impeded; even though it took six months, they were eventually able to uncover the relevant facts of the case. *Id*. In contrast, the Seventh Circuit did find that the right to court-access had been violated in *Bell*. But in that case, police had covered up a fatal police shooting by planting a knife in the victim's hand and then convincing the victim's family that the victim was actually the assailant, which ultimately prevented the family from "learn[ing] the facts of [the] case" and "rendered

11

hollow" the family's attempt to pursue a wrongful death suit against the city. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984). The plaintiffs in *Bell* did not have personal knowledge of the actual facts.

Wang's case is much closer to *Thompson*, *Vazquez*, and *Rossi*, where there was no violation of the court-access right, than to *Bell*. To be clear, as Defendants point out, Wang does not explicitly identify which underlying legal action was impeded by the alleged fabrication of evidence. R. 19, Defs.' Br. at 9. Applying a generous reading to her complaint, though, the two possibilities seem to be the criminal case against Chueh, which resulted in a not-guilty verdict, and the current civil case. But either way, the same legal principles apply.[5] There is no question that Wang has personal knowledge of all of the relevant facts against Chueh—she was there that night. In other words, Wang would have been fully able to testify in the criminal case against Chueh and present her version of events in court. It might be true that her credibility would have been bolstered if it had been corroborated (as opposed to contradicted) by the police reports prepared by Defendants, but that is not the correct inquiry for this claim. Rather, the focus is on whether her "ability to obtain legal redress" was hampered, not just whether her case "would have been *better*." *Rossi*, 790 F.3d at 735 (emphasis added). Indeed, it is significant that Chueh was prosecuted at all; even accepting as true Wang's allegations that the Defendants falsified their reports, that

---

[5]In fact, Wang might even have a better shot with the civil case. The Court is skeptical that her right to access the courts encompasses the "right" to see *someone else* (that is, Chueh) not only be subject to criminal prosecution, but also to be found guilty (which is what she really takes issue with, given that there is no dispute that he was prosecuted). *See Diamond v. Charles*, 476 U.S. 54, 64 (1986) (noting that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another").

did not stop a second group of officers from investigating, arresting, and ultimately charging Chueh just one day after the incident.

The same holds true for the current civil case against Chueh. Nothing that Defendants did has prevented Wang from bringing her battery and emotional distress claims against Chueh—she has full knowledge of the events of the night in question, and, as the content of the Second Amended Complaint makes clear, she has been able to present her full version of events to a court. Again, the inquiry is not whether Wang's battery and emotional distress claims would have been *stronger* if the Defendants had not lied; there is no doubt that Wang would have an easier time prevailing on her civil claims if she could point to a police report that backed up her story. But the key here is that Wang *has* been able to bring these claims and assert her version of the facts. Even if Chueh disputes her story and offers contradictory evidence (including the police report prepared by Defendants), that does not mean Wang herself has somehow been blocked from accessing her right to bring her civil claims in the first place.

Thus, Wang has failed to allege an access to the courts claim against Officers Chereso, Friloux, and Bridges, so the § 1983 claim is dismissed against these Defendants.[6] The dismissal is with prejudice, because she has already amended the

---

[6]Although the Defendants do not raise this point, there is a possibility that even if there were an access-to-the-courts violation here, the officers would have been entitled to qualified immunity. "Qualified immunity shields a government official from liability for damages when the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (cleaned up). Here, although it may be quite obvious that police officers should not falsify their police reports, it is nonetheless not clearly established that falsifying a police report will violate the rights of the *victim* of a crime

complaint twice. It is also worth noting that Wang briefly mentions that Defendants also violated her "rights under the Victim's Rights provisions of the Illinois Constitution," Wang Compl. ¶ 37, but she does not flesh out this state constitutional claim at all in her briefing. To the extent that Wang is still trying to pursue a state constitutional claim through this count, the Court is not expressing any substantive holding on whether Wang has successfully pled a state-law claim. Instead, the Court relinquishes jurisdiction over any state-law claim.

Finally, to the extent that Wang is also seeking to hold the City liable on this count, that claim must also fail. A municipality cannot "be sued under § 1983 for an injury inflicted solely by its employees or agents," unless the injury was caused by an official "policy or custom." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Here, Wang has not identified any municipal policy or custom that caused the alleged denial of her access to the courts.

### 2. Conspiracy (Count 3)

Wang also alleges that Officers Chereso, Friloux, and Bridges *conspired* (with Chueh) to deny her access to the courts under both 42 U.S.C. § 1983 and state law. Pl.'s Resp. Br. at 4. Specifically, Wang claims that the Defendants "reached an understanding and agreement, engaged in a course of conduct, and otherwise conspired among and between themselves to violate [Wang's] constitutional rights and rights under Illinois law." Wang Compl. ¶ 30. Wang identifies three overt acts: "(1) providing false information to detectives and prosecutors; (2) falsifying reports;

---

(as opposed to the rights of someone who is wrongfully accused of a crime) to bring a subsequent civil case against an offender, or to see the offender be criminally prosecuted.

14

and (3) providing false testimony under oath." *Id.* ¶ 31. Again, she contends that the City is also liable as the employer of the officers. *Id.* ¶ 33.

But a claim for conspiracy under § 1983 requires "an actual denial of a civil right … before a cause of action arises." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). Here, the conspiracy claim is premised on the access to the courts claim discussed earlier. Because the access-to-the-courts claim fails, though, there is also no basis for a conspiracy claim against the individual Defendants. And as for the City, she again fails to identify a *Monell* policy or custom, so the § 1983 claim against the City is also dismissed. (Again, though, the Court takes no position on the state-law conspiracy claim, to the extent Wang is pursuing one premised on the Illinois constitution.)

### 3. Remaining State Claims

That just leaves Wang's state-law claims. Specifically, she brings an indemnification claim against the City under 735 ILCS 10/9-102. Wang Compl. ¶ 41. There are also the potential state constitutional claims and the state conspiracy claim mentioned above. But with the dismissal of Wang's federal claims, the Court chooses to relinquish supplemental jurisdiction over her state claims (including the battery and emotional distress claims against Chueh). When all federal claims are dismissed from a case, "there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (*per curiam*) (citing cases). Indeed, this presumption is statutorily expressed in 28 U.S.C. § 1367(c)(3), which provides for the discretionary

relinquishment of jurisdiction over state claims when the claims providing original jurisdiction (here, federal-question jurisdiction) have been dismissed (as discussed next, Chueh's claims are premised only on state law). So, the rest of Wang's claims are dismissed without prejudice, and the case will be remanded to state court.

### B. Motion to Dismiss Chueh's Claims

Letting go of Chueh's third-party claims and cross-claims is also appropriate. Chueh has made clear that he is only pursuing state claims (even though his complaint had some references to federal law). R. 52 at 2. Specifically, Chueh seeks indemnification and contribution under the Illinois Contribution Act, 740 ILCS 100/1 *et. seq.*, from Officers Kilgore, Hoyou, Salazar, and Stribling; the Police Superintendent; and the City in the event that he is held liable on Wang's battery and emotional distress claims. So here, too, the Court dismisses Chueh's state claims without prejudice to refiling in state court. Because the Court is relinquishing jurisdiction over the entire case, the motion to dimiss Chueh's claims is terminated without prejudice.

### IV. Conclusion

For the reasons discussed, the motion to dismiss Wang's complaint, R. 19, is granted with prejudice as to the federal claims because Wang has already amended her complaint twice. The Court relinquishes supplemental jurisdiction over the remaining state claims in the case, so the motion to dismiss Chueh's third-party and cross-complaint, R. 46, is terminated without prejudice. The case is remanded to the

Circuit Court of Cook County. The status hearing of April 30, 2020 is vacated, and the Court will enter final judgment.

ENTERED:

<pre>      s/Edmond E. Chang      
Honorable Edmond E. Chang
United States District Judge</pre>

DATE: March 29, 2020